**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF ARKANSAS, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF MAINE, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OHIO, STATE OF OREGON**, and **STATE OF TEXAS**

*Plaintiffs*,

v.

**CVET TOPCO, L.P., CLAYTON, DUBILIER & RICE, LLC, TPG, INC., COVETRUS, INC., CENCORA, INC.**, and **MWI VETERINARY SUPPLY, INC.**

*Defendants*.

Case No.: 1:26-cv-10140-JPO

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**COMPLAINT FOR PERMANENT INJUNCTION**

Plaintiffs Federal Trade Commission ("FTC" or "Commission"), and the states of Arizona, Arkansas, California, Colorado, Maine, Michigan, Minnesota, Nebraska, New York, North Carolina, Ohio, Oregon, and Texas, acting by and through their respective Attorneys General (collectively, "Plaintiff States" and with FTC, "Plaintiffs"), by their designated attorneys, petition this Court pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, to grant a permanent injunction preventing CVET Topco, L.P. and its affiliates Clayton, Dubilier & Rice, LLC, TPG, Inc., and Covetrus, Inc. (collectively, "Covetrus") from acquiring MWI Veterinary

Supply, Inc. ("MWI") from Cencora, Inc. (the "Proposed Transaction") in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. Plaintiffs seek this relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26.

## NATURE OF THE CASE

1. Veterinarians across the country rely on distributors for the supplies and equipment they need to treat Americans' pets. Large veterinary clinic distributors procure and warehouse tens of thousands of products, such as pharmaceuticals, vaccines, "white goods" (supplies like gloves, gauze, and syringes, etc.), surgical supplies, and capital equipment from manufacturers. Distributors' customers range in size from independent, single-veterinarian practices to large corporate accounts with hundreds of locations across the country. To effectively compete for and serve their veterinary clinic customers, the top distributors maintain an unmatched product catalog and inventory to ensure they can serve as a one-stop shop for veterinarians' supply needs. Veterinarians, in turn, value large distributors' product breadth and depth built on distributors' extensive manufacturer-supplier networks, volume rebates and discounts, national geographic reach, next-day shipping, centralized purchasing, sign-on bonuses, and other services.

2. Covetrus and MWI (collectively, "Defendants") are the two largest distributors of veterinary supplies in the United States, and for years they have waged [redacted] to win veterinary clinic customers. In early 2023, MWI opened [redacted] According to Covetrus executives, MWI's [redacted] was [redacted] and leaving Covetrus [redacted] Covetrus executives sounded alarm bells: [redacted]

[redacted] and, as a result, [redacted] with MWI [redacted] MWI's willingness to [redacted] to win business has put tremendous competitive pressure on Covetrus. Covetrus internally braced itself to [redacted] In response to MWI's aggressiveness, Covetrus's CEO was [redacted] and declared: [redacted]

3. To combat [redacted], Covetrus developed its own competitive strategies, such as a rebate associated with VetSuite—a bundle of products including veterinary clinic distribution, practice management software, an online pharmacy, a compounding pharmacy, and payment processing. Covetrus also initiated a new strategy it called [redacted] to fight back against increasing price competition from MWI. The Covetrus North America Chief Operating Officer encouraged Covetrus employees to compete [redacted] But after years of taking it [redacted] while [redacted], Covetrus realized [redacted] So Covetrus decided there was a path more attractive than competition; it would simply acquire its closest competitor.

4. Covetrus documents [redacted] in order to raise prices. In June 2025, amid the price war, the President of Covetrus North America lamented that [redacted] and [redacted] Shortly before entering into negotiations with MWI, Covetrus's CEO tasked the President of Covetrus's North America business to initiate [redacted] in pursuit of its goal of [redacted] In Covetrus's

due diligence for a transaction with MWI, the President of Covetrus's North America business emphasized that [redacted] The merged firm's [redacted] plan is transparent: [redacted]

5. The customers who benefit most from competition between Covetrus and MWI are the veterinary practices that care for Americans' pets. The intense head-to-head competition between Covetrus and MWI for both independent veterinary clinic and large corporate account customers drives down the costs of veterinary supplies and improves the speed and accuracy with which they are delivered.

6. Veterinary practices reacted to the news of the Proposed Transaction with alarm. One MWI sales director relayed hearing [redacted] in response to the announcement of the Proposed Transaction, with some customers fearing [redacted] Customers recognize that Covetrus and MWI are each other's closest competitor and frequently play them off each other to obtain lower pricing and better terms. For example, veterinarians often use an online price comparison tool, Vetcove, to their advantage in negotiating more effectively with both distributors for better pricing. Vetcove has further intensified competition between Covetrus and MWI by enabling veterinarians [redacted]. Indeed, Covetrus and MWI often lower prices, increase discounts, and offer incentives to win business from one another. The Proposed Transaction, therefore, weakens veterinary clinics' negotiating leverage, removes head-to-head competitive bidding, and will likely increase the cost of essential pharmaceuticals, equipment, and medical supplies for veterinary clinic customers and, in turn, the costs of veterinary care offered to tens of millions of American pet owners.

7. Today, Covetrus and MWI offer veterinary clinic distribution services in direct competition with one another to both independent veterinarians and to veterinary groups that have dozens, or even hundreds, of locations. The latter, sometimes referred to as "corporate accounts," consist of entities that own multiple clinics, spend more annually on supplies, and have regional or national geographic footprints. Large corporate account customers typically negotiate with veterinary clinic distributors to obtain discounts based on volume of purchases and other factors. Independent veterinarians and small practice groups may join one or more group purchasing organizations ("GPOs"), which negotiate volume discounts from distributors on behalf of their member clinics. Covetrus owns two GPOs.

8. Customers, competitors, and Defendants themselves agree that Covetrus and MWI are the top two veterinary clinic distributors in the United States. Covetrus ordinary course documents routinely refer to MWI as [redacted] Similarly, MWI ordinary course documents are [redacted]. Defendants are also two of only three veterinary clinic distributors with the national scale capable of offering a full broadline suite of products and services to veterinary clinics. For this reason, veterinary clinic customers routinely refer to Covetrus, MWI, and Patterson Veterinary Supply ("Patterson") as the "big 3."

9. Patterson, the third-largest veterinary clinic distributor, is unlikely to constrain the combined firm post-merger. According to Covetrus, [redacted] Covetrus [redacted]

[redacted] When bidding for a large corporate account, Covetrus recognized that:

> [redacted]

Even before the Proposed Transaction, Covetrus internally believed that [redacted] with a Covetrus executive concluding [redacted]

10. In line with customers' views and Defendants' ordinary course documents, (1) veterinary clinic distribution and (2) distribution to large corporate accounts are relevant product markets for assessing the competitive effects of the Proposed Transaction. The product breadth and depth that Defendants offer are key factors that give them a competitive edge with customers in both of these markets and distinguish them from other veterinary product suppliers. Other channels, such as manufacturer-direct purchases or retail, are not viable substitutes for veterinary clinic distribution because they offer significantly fewer products, and lack the logistical scale, inventory management, or one-stop-shop services of veterinary distributors. Manufacturers sell only their own proprietary pharmaceuticals and lack the technological or logistical capabilities required to distribute [redacted] of stock keeping units ("SKUs") to the more than 30,000 veterinarians in the United States with the speed vets require to maintain adequate supply. Though customers can purchase many individual veterinary products piecemeal from other sources, those other sources lack the broad, comprehensive, convenient, economical, and efficient service offering of distributors. As such, veterinary clinic customers that make piecemeal purchases of some supplies still rely on veterinary distributors to supply most of the products they need.

11. Covetrus and MWI are the two top players in each relevant market. If consummated, the Proposed Transaction would combine the largest and second-largest veterinary clinic distributors to create a combined firm controlling over a 50% share of the veterinary clinic distribution market nationally. This massive accumulation of market share and market power would eliminate fierce head-to-head competition between Defendants that has resulted in lower prices and better customer service to the benefit of clinics and, ultimately, pet owners.

12. The Proposed Transaction would result in even higher concentration levels in the market for distribution to large corporate accounts, with market shares in excess of 60%. Large corporate accounts, most of which span many states and regions, generally prefer to contract with a national distributor that can serve all of their clinics across multiple regions. Large corporate accounts frequently leverage competition between Covetrus and MWI for the coveted position of primary distributor, where the corporate account agrees to purchase the vast majority of its supplies, typically between [redacted] from its primary distributor and, in return, receives a significant rebate on those purchases and upfront cash incentives that may total millions of dollars. Those clinic-level savings benefit pet owners when veterinarians pass through lower costs as a result of the competition between Covetrus and MWI.

13. Under the relevant case law and the 2023 U.S. Department of Justice and Federal Trade Commission Merger Guidelines (“Merger Guidelines”), the extraordinarily high post-merger market shares, the market concentration levels, and the increase in concentration for veterinary clinic distribution services and veterinary clinic distribution services to large corporate accounts render the Proposed Transaction presumptively unlawful. In addition, the Proposed Transaction is unlawful because it eliminates substantial head-to-head competition between Defendants.

14. In sum, the Proposed Transaction would eliminate competition between the two largest and most competitively significant veterinary clinic distributors for both independent vets and large corporate accounts, leading to higher prices, fewer discounts, reduced product offerings, and diminished service quality for veterinary clinics—and ultimately, to higher prices for pet owners across the United States.

15. The Plaintiffs bring this action to preserve the competition between Covetrus and MWI that the Proposed Transaction would eliminate if allowed to proceed. Defendants have stipulated to entry of a temporary restraining order that prevents Defendants from consummating the Proposed Transaction prior to December 4, 2026. Ultimately, Plaintiffs request the Court permanently enjoin the Proposed Transaction.

**JURISDICTION AND VENUE**

16. The Proposed Transaction constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

17. This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and it is brought by an agency of the United States authorized by an Act of Congress to bring this action.

18. Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

19. The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute. Fed. R. Civ. P. 4(k)(1)(C). Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(c)(3), as well as

under 28 U.S.C. § 1391(c)(2) and 15 U.S.C. § 53(b). Defendants are subject to personal jurisdiction in this state and district because they are found, reside, and/or transact business therein, including serving veterinary clinics in this district.

20. In conjunction with the FTC, Plaintiff States bring this action for a permanent injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff States have the requisite standing to bring this action as *parens patriae* because the Proposed Transaction threatens to cause injury to the general economy of their respective states.

## THE PARTIES AND THE PROPOSED TRANSACTION

21. Plaintiff, the Federal Trade Commission, is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41-58, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

22. Plaintiff State of Arizona is a sovereign state of the United States. Plaintiff State of Arizona brings this action by and through its Attorney General. The Attorney General of the State of Arizona is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Arizona to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

23. Plaintiff State of Arkansas is a sovereign state of the United States. Plaintiff State of Arkansas brings this action by and through its Attorney General. The Attorney General of the State of Arkansas is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Arkansas to protect the State, the general economy, and its

residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

24. Plaintiff State of California is a sovereign state of the United States. Plaintiff State of California brings this action by and through its Attorney General. The Attorney General of the State of California is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of California to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

25. Plaintiff State of Colorado is a sovereign state of the United States. Plaintiff State of Colorado brings this action by and through its Attorney General. The Attorney General of the State of Colorado is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Colorado to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

26. Plaintiff State of Maine is a sovereign state of the United States. Plaintiff State of Maine brings this action by and through its Attorney General. The Attorney General of the State of Maine is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Maine to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

27. Plaintiff State of Michigan is a sovereign state of the United States. Plaintiff State of Michigan brings this action by and through its Attorney General. The Attorney General of the State of Michigan is the chief legal officer for the State and brings this action on behalf of the

State and the people of the State of Michigan to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

28. Plaintiff State of Minnesota is a sovereign state of the United States. Plaintiff State of Minnesota brings this action by and through its Attorney General. The Attorney General of the State of Minnesota is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Minnesota to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

29. Plaintiff State of Nebraska is a sovereign state of the United States. Plaintiff State of Nebraska brings this action by and through its Attorney General. The Attorney General of the State of Nebraska is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Nebraska to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

30. Plaintiff State of New York is a sovereign state of the United States. Plaintiff State of New York brings this action by and through its Attorney General. The Attorney General of the State of New York is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of New York to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

31. Plaintiff State of North Carolina is a sovereign state of the United States. Plaintiff State of North Carolina brings this action by and through its Attorney General. The Attorney General of

the State of North Carolina is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of North Carolina to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

32. Plaintiff State of Ohio is a sovereign state of the United States. Plaintiff State of Ohio brings this action by and through its Attorney General. The Attorney General of the State of Ohio is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Ohio to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

33. Plaintiff State of Oregon is a sovereign state of the United States. Plaintiff State of Oregon brings this action by and through its Attorney General. The Attorney General of the State of Oregon is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Oregon to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

34. Plaintiff State of Texas is a sovereign state of the United States. The State of Texas brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents and to prevent and restrain the violation by Defendants of Section 7 of the Clayton Act, 15 U.S.C. § 18.

35. Defendant CVET Topco, L.P. is a holding entity and the ultimate parent entity of Covetrus.

36. Defendant Clayton, Dubilier & Rice, LLC ("CD&R"), is a private equity firm headquartered in New York, New York. Today, CD&R holds a [redacted] in Covetrus, and three CD&R partners sit on Covetrus's Board, including the Chairman of the Board, Phil Knisley.

37. Defendant TPG, Inc. ("TPG"), is a private equity firm headquartered in Dallas, Texas, and San Francisco, California. Today, TPG holds a [redacted] interest in Covetrus, and two TPG partners sit on Covetrus's eight-member board.

38. Defendant Covetrus, Inc., headquartered in Portland, Maine, is the second-largest veterinary clinic distributor in the United States. Covetrus provides distribution services to companion animal (i.e., cats and dogs), equine, and mixed veterinary practices. Covetrus operates 14 distribution sites across the United States, providing nationwide distribution of a broad range of products, including pharmaceuticals, vaccines, surgical instruments, diagnostic equipment, and nutrition products, alongside proprietary private label consumables. Covetrus provides several additional technology and pharmaceutical offerings, including practice information management software, payment processing, prescription management software, and compounding services. Covetrus vRxPro provides home delivery of vet-recommended products.

39. Defendant Cencora, Inc., previously AmerisourceBergen, is headquartered in Conshohocken, Pennsylvania. Cencora is a publicly traded global pharmaceutical sourcing and distribution services organization, focusing on both human and animal health. In 2015, AmerisourceBergen acquired MWI Veterinary Supply, Inc.

40. Defendant MWI, headquartered in Boise, Idaho, is the largest companion animal veterinary distributor in the United States. MWI provides distribution services to companion animal, equine, and production animal (e.g., livestock on feedlots) veterinarians. MWI's 13

companion animal distribution centers provide nationwide coverage for the supply of an array of veterinary products, including pharmaceuticals, vaccines, surgical instruments, diagnostic equipment, and private label products. MWI also provides software offerings, including AllyDVM and digital herd management, as well as precision feed delivery services.

41. On February 17, 2026, Covetrus and MWI signed a Share Purchase Agreement pursuant to which Covetrus will acquire all the voting securities of MWI from Cencora for approximately $3.5 billion in cash and equity. Today, Covetrus is [redacted], with a debt load equal to over [redacted] times its earnings. Covetrus is financing the Proposed Transaction by taking on $3 billion in debt, including a refinancing of its existing $1.8 billion debt.

42. On November 13, 2026, by a 2-0 vote, the Commission found reason to believe that the Proposed Transaction may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, or constitutes an unfair method of competition in violation of Section 5 of the FTC Act, and authorized the filing of this action.

## RELEVANT MARKETS

### A. The Relevant Product Markets Are Veterinary Clinic Distribution and Distribution to Large Corporate Accounts

#### *1. Veterinary Clinic Distribution*

43. Veterinary clinic distribution involves the warehousing, sale, and distribution of a broad range of companion animal and equine veterinary products, including vaccines, pharmaceuticals, white goods (supplies like gloves, gauze, and syringes), and private label products (including private-label pharmaceuticals), as well as related services including in-clinic support and inventory management. Distributors sell these products to veterinary practices for use in their clinics. Veterinary clinic distribution is not reasonably interchangeable with other channels (e.g.,

direct sales by manufacturers or retail sales). Veterinary clinic distribution customers, including both corporate accounts and independent veterinarians, do not consider specialty distributors, manufacturers, or retailers to be viable substitutes to distributors of veterinary products. Rather, several key factors distinguish veterinary clinic distribution, including:

a. Product Breadth and Depth: Independent veterinarians, corporate accounts, and GPOs demand a distributor that carries a broad array of thousands of SKUs. Included in this comprehensive offering are branded pharmaceuticals (e.g., Convenia, Proheart), generic pharmaceuticals (e.g., tiletamine, cosyntropin), human pharmaceuticals that veterinarians can prescribe for animals (e.g., propofol), parasiticides, vaccinations (e.g., rabies, distemper), anesthesia systems, equipment (e.g., x-ray imaging, monitors), medical supplies (e.g., surgical instruments, pumps), practice supplies (e.g., autoclaves and ultrasonic cleaners), white goods (e.g., bandages, gauze), and dentistry supplies, among others. Veterinary clinic distributors carry a variety of products across many categories, which allows them to satisfy customer demand for product breadth. Veterinary clinic distributors also carry a deeper inventory of products, which protects veterinary clinics from encountering significant backlog when ordering products for their clinics. Covetrus and MWI offer [redacted] from hundreds of manufacturer-suppliers. Customers value this product breadth and depth for consistent supply and inventory management, a combination that very few other distributors can match.

b. Private Label: Customers value having access to a broad selection of private label (i.e., distributor-branded) products, including pharmaceuticals, surgical products, and orthopedic implants, because they are typically lower cost than manufacturer-branded items. Covetrus and MWI offer [redacted].

c. Warehousing and Shipping Services: Veterinary clinic distributors operate large warehouses specifically for broadline distribution and stock a wide variety of products with sufficient inventory to meet veterinary clinics' projected needs. These assets enable distributors to offer customers reliable, frequent, speedy (i.e., next-day or two-day shipping), and flexible delivery of assorted products. Veterinary clinic distribution facilities must also obtain state licenses related to handling of controlled substances and ensure proper temperature control and storage of pharmaceuticals and medical equipment. In addition, customers value distributors' inventory management services, which allow clinics to have consistent supply across thousands of SKUs without using in-clinic space to store goods.

d. Customer Service: Veterinary clinic distributors typically provide high levels of customer service, including national and regional account managers for large customers and regular in-clinic support from experienced sales representatives. These distributors typically employ large sales forces to win business, maintain relationships with customers, and provide in-clinic support.

e. Consolidated Contracting and Purchasing: Clinics benefit from centralized, one-stop contracting and purchasing, which are both more efficient for clinics. Large, national distributors like the "big 3" offer clinics the ability to purchase bulk or discrete products—across all product types—which minimizes the number of suppliers that clinics must manage, reduces shipping costs, consolidates shipments, and initiates shipments to multiple affiliated clinics. Consolidated purchasing also allows veterinarians to take advantage of rebates and discounts [redacted] Only a few distributors, including the Defendants, offer

sufficient product breadth, as well as volume rebates and discounts, to provide customers with the benefits of consolidated, one-stop contracting and purchasing.

f. Volume Discounts and Rebates: Distributor incentive programs offer substantial discounts and rebates in exchange for volume commitments, with larger volume commitments resulting in steeper discounts and/or greater rebates. Customers value the savings that these incentive programs provide. For many veterinary clinics, these volume discounts and rebates enable their practices to succeed in the face of rising input prices.

g. Widespread Manufacturer/Supplier Contracts: Distributors rely upon their extensive networks of manufacturer and supplier logistics and contracting to obtain a broad range of animal health supplies. Distributors like Covetrus and MWI cultivate relationships and work to contract with all major pharmaceutical manufacturers, including the largest branded manufacturers, smaller branded manufacturers, and generic manufacturers.

44. Covetrus and MWI recognize clinics' preference for a one-stop-shop distributor. Covetrus claims to provide "[e]verything you need, all in one place" and boasts: "Our one-stop eCommerce experience offers competitive pricing for a wide variety of products and equipment across the continuum of care . . ." Likewise, MWI advertises itself as providing "[e]verything you need, right at your fingertips" "[w]ith thousands of animal health products available to purchase, we have what you're looking for." Patterson similarly describes itself as "a full-line distributor."

45. Veterinary clinics often rely on a single distributor for the vast majority of their supply needs, but most veterinarians also make some purchases through other suppliers. For example, some pharmaceutical manufacturers only sell their patent-protected drugs directly (rather than through distributors like Covetrus and MWI) and veterinarians may use a different supplier if a

product is backordered or available more quickly from another supplier. Nonetheless, veterinarians prefer to consolidate their purchases through a primary distributor when possible because doing so minimizes shipping costs, maximizes rebates offered by the distributor, and reduces the time and resources needed to track multiple deliveries and returns. Without the volume resulting from consolidated purchases, veterinary clinics risk losing the rebates and discounts that enable them to operate.

46. Covetrus and MWI recognize veterinary clinic distribution as a distinct relevant product market. For example, Covetrus's [redacted] Covetrus's owner, CD&R, likewise [redacted]. MWI also [redacted]

47. Other veterinary product channels, such as specialty distributors, manufacturers, and retailers, are not in the relevant product market.

a. <u>Specialty Distributors</u>: Specialty distributors sell a limited number of specialty products, such as human generic medication that may be used to treat animals. These specialty distributors are not reasonably interchangeable with, or an adequate substitute for, veterinary clinic distribution. Rather, specialty distributors generally focus on selling a small fraction of the thousands of products that veterinary clinic distributors provide. Veterinary clinics also cannot rely on specialty distributors to provide the high level of

customer service, delivery flexibility and frequency, and centralized procurement process that veterinary clinic distributors offer.

b. Manufacturer Direct: Purchasing supplies directly from manufacturers likewise is not reasonably interchangeable with, or an adequate substitute for, veterinary clinic distribution. Covetrus and MWI contract with hundreds of suppliers for [redacted] of veterinary supplies, saving clinics the time and expense of procuring supplies directly from each manufacturer. Manufacturers lack the technological and logistical capabilities necessary to provide timely and frequent deliveries of a broad range of products. Manufacturers also cannot offer customers the full range of products that veterinary clinic distributors offer. The manufacturers that sell products directly to veterinary clinics offer hundreds of SKUs or fewer, compared to the [redacted] offered by Defendants. Manufacturers also sell only their own products, not products made by other suppliers. Indeed, manufacturers leverage veterinary clinic distributors' networks for demand generation, marketing, logistics, shipping, and customer relationships. Moreover, very few manufacturers have the licenses required to ship pharmaceuticals and controlled substances to veterinary clinics across all 50 states. As a result, veterinary clinics cannot fully replace distributors with manufacturer-direct purchases.

c. Retail: Retail is also not a substitute for veterinary clinic distribution. Retailers such as Costco and Chewy carry a limited range of products, primarily pharmaceuticals, and sell those products directly to pet owners rather than to veterinary clinics for in-clinic use. While veterinary clinic distributors carry thousands of SKUs, retailers often carry only hundreds of SKUs. Further, several retailers [redacted]

d. Production Animal Distribution: Distribution of products sold for the treatment of production animals (e.g., livestock on feedlots) is also not a substitute for veterinary clinic distribution. Production animal products are not intended to treat the types of animals that receive care at veterinary clinics. Moreover, production animal veterinarians tend to work at feed lots rather than clinics. Today, given that Covetrus does not have a production animal business, the Defendants do not compete with each other for production animal veterinary customers.

48. These other animal health product channels, i.e., specialty distributors, manufacturers, retailers, and suppliers of production animal products, do not impose a meaningful competitive constraint on veterinary clinic distributors. One way to determine whether these various animal health channels should be considered in the same product market as veterinary clinic distributors, as described in applicable case law and the Merger Guidelines, is by applying the hypothetical monopolist test. Under this test, if a single firm (i.e., a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and could profitably undertake a small but significant and non-transitory increase in price or other worsening of terms ("SSNIPT"), then that group of products is a properly defined antitrust product market. A hypothetical monopolist could profitably impose a small, but significant and non-transitory increase on the price of the bundle of products sold through veterinary clinic distribution because an insufficient number of customers would switch to other animal health product channels to make the increase unprofitable. Accordingly, veterinary clinic distribution is a relevant product market.

*2. Distribution to Large Corporate Accounts*

49. The largest veterinary clinic distributors, including Defendants, fiercely compete to be the primary distributor for large corporate accounts. Large corporate accounts are a distinct set of

customers for veterinary clinic distribution that also constitute a distinct relevant antitrust market in which to analyze the competitive effects of the Proposed Transaction. Large corporate accounts include corporate veterinary groups that have hundreds of veterinary clinics, often across multiple states. Some of the largest corporate accounts have over 900 clinics across the United States.

50. Large corporate accounts are typically larger volume accounts in which distribution spend is consolidated across multiple veterinary clinics. In contrast with independent veterinary clinics, large corporate accounts often negotiate centralized contracts with veterinary clinic distributors for distribution across several states or regions. As a result, large corporate accounts generally prefer to contract with a primary distributor. These distributors have the scale of supply and geographic reach necessary to adequately service all of a large corporate account's locations and provide discounted pricing in exchange for the associated purchase volume. Typically, a corporate account commits to purchase the majority, or vast majority, of its supplies from a primary distributor in exchange for significant rebates and discounts. The Defendants and industry participants often refer to meeting these volume requirements as [redacted]

51. Distribution services to large corporate accounts are distinguished by several key attributes, including:

a. <u>Procurement Processes</u>: In contrast with customers that purchase on an as-needed basis, large corporate accounts generally procure veterinary clinic distribution services through formal contracts. These often take the form of primary distributor contracts awarded through formal request for proposal ("RFP") processes, auctions, or direct negotiations, which typically yield cost savings compared to other customers. During the selection process, large corporate account customers commonly evaluate each distributor's offer

against several criteria, including pricing, rebates, geographic coverage, quality of service, and other non-price terms. Other large corporate accounts negotiate competitive primary distributor contracts without formal RFPs. Contracts between corporate account customers and distributors often involve substantial distributor discounts and/or rebates in exchange for volume commitments, with larger volume commitments leading to steeper discounts and/or greater rebates. Thus, large corporate account customers generally benefit from multiple veterinary clinic distributors competing to be their primary distributor to maximize their discounts and rebates.

b. Consolidated Purchasing: Large corporate accounts generally prefer to consolidate purchasing, thereby limiting the vendors the customer must manage across its many individual clinics. Consolidating procurement within a primary distributor limits the invoices, accounts, deliveries, and other administrative burdens associated with disaggregated purchasing across many distributors. Consolidated purchasing with one distributor also enables vet clinics to take advantage of rebates and discounts tied to purchase volume.

c. Lower Prices: Large corporate accounts can command lower prices by consolidating purchases with a primary distributor. Large corporate accounts frequently take advantage of their scale by negotiating a primary distributor relationship with one veterinary distributor (most often either Covetrus or MWI) and agreeing to purchase a minimum volume, typically [redacted] of their veterinary supplies, from that primary distributor in exchange for steep discounts and higher rebates on those supplies.

d. Upfront Sign-On Bonuses: Distributors vie for large corporate accounts by offering various discounts including "prebates" (i.e., lump sum up-front rebates or signing

bonuses), in addition to other rebates and price concessions. Distributors offer sign-on bonuses to entice customers, and the Defendants often compete to [redacted]

e. National or Multi-Regional Distribution: Large corporate accounts typically centralize purchasing across many geographically dispersed locations. They generally require distribution that can service all their affiliated clinics, which may span several states or regions. For example, a corporate account with locations across the country would not be able to rely on a primary distributor with only a few warehouses in the eastern United States.

f. High Levels of Service: A primary distributor frequently assigns dedicated strategic account managers to large corporate accounts that focus specifically on the needs of larger clinics with multiple locations. As part of a primary distributor contract, corporate accounts may also negotiate superior non-price terms that include centralized reporting, more generous ordering windows and shipping terms, and specific customer service commitments.

g. Comprehensive Product Breadth and Depth: To serve as a primary distributor for large corporate accounts, a distributor must offer a comprehensive range of products, such as medical supplies, pharmaceuticals, vaccinations, white goods, and equipment. Primary distributors also must maintain a sufficient supply of these products to support on-demand purchases from larger accounts. Smaller distributors often lack both the product breadth and depth to fulfill the product variety needs of many large corporate accounts. Reflecting their size and broad geographic footprints, large corporate account customers require a primary distributor that offers many products in many categories.

h. <u>Demonstrated History of Success and Reputation</u>: Large corporate account customers typically look to consolidate their spend among distributors that have a demonstrated history of success serving other large corporate account customers. Veterinary clinic distribution is complex, requiring the ability to purchase, warehouse, and ship thousands of products from a variety of product categories. Substantial delays, backorders, issues with product packaging, or other failures to deliver high-quality products on a timely basis can put the life and health of clinic patients at risk. To minimize these risks and to ensure that any problems will be resolved quickly, large corporate account customers seek distributors with a demonstrated history serving similar large corporate accounts.

52. Defendants distinguish between large corporate accounts and independent vet clinics in the ordinary course of business. For example, Covetrus's CFO boasted that [redacted] Defendants typically describe corporate veterinary practices as a type of [redacted] in contrast with independent veterinary clinics. Likewise, a presentation to Covetrus's Board of Directors [redacted]

53. Covetrus and MWI documents repeatedly refer to competition between the two companies for the coveted and lucrative role of "primary distributor" to large corporate accounts. In one exchange, a Covetrus Account Executive [redacted] MWI executives similarly discuss [redacted]

[redacted] as the [redacted] for a large corporate account and [redacted] for these types of strategic accounts.

54. Large corporate accounts that issue RFPs seeking primary distributors tend to issue them to Covetrus, MWI, Patterson, and, with less frequency, Midwest. Midwest, the fourth-largest veterinary clinic distributor in the United States, [redacted] Even when large corporate accounts include distributors other than Covetrus, MWI, and Patterson in their initial RFPs, they typically eliminate those other distributors because the distributors cannot meet the needs of their veterinary practices. Indeed, Covetrus's Head of Strategic Accounts responded to a mention of veterinary clinic distributor Penn Vet with, [redacted]

55. Manufacturers, specialty distributors, and retailers generally do not participate in the RFP process to become a primary distributor and cannot provide the broadline product portfolio and high levels of service that large corporate accounts require.

56. Thus, distribution to large corporate accounts is a second relevant product market in which to analyze the Proposed Transaction's likely competitive effects.

**B. The Relevant Geographic Market Is No Broader Than the United States**

57. Covetrus and MWI compete to provide veterinary clinic distribution to both corporate veterinary clinics and smaller, independent veterinary clinics through a network of distribution centers. These distribution centers are strategically located throughout the country to serve both customer segments across the United States.

58. Many large corporate accounts have locations nationwide or across multiple regions in the United States. These veterinary clinics strongly prefer to obtain most of their veterinary supplies from a national distributor rather than enter into multiple contracts with regional

distributors. This preference is driven by multiple factors, including the administrative convenience of reduced ordering and inventory management, faster delivery times, and increased product availability. Large corporate accounts and distributors negotiate geographically agnostic prices and discounts that apply across multiple regions to clinics within the same larger corporate account.

59. Smaller, independent veterinary practices typically use large, national veterinary clinic distributors because large, national distributors offer clinics the administrative convenience of reduced ordering and inventory management, faster delivery times, and increased product availability.

60. [redacted]

61. MWI and Covetrus, other veterinary distributors, customers, and other industry participants recognize the existence of a national market for veterinary clinic distribution and distribution to large corporate accounts. Suppliers identify the national distributors and their ability to serve veterinary clinics that require a national presence.

62. Both Covetrus and MWI have dedicated sales teams [redacted]. MWI touts its [redacted] with [redacted] Similarly, Covetrus markets its [redacted] with [redacted] Covetrus markets its ability to serve [redacted]

63. There may also be smaller, regional relevant geographic markets for the provision of veterinary clinic distribution. Smaller customers of veterinary clinic distributors require proximity to distribution centers because they regularly need frequent deliveries, next-day

deliveries (often at specific delivery times), and the rapid fulfillment of emergency orders. In certain regions and local areas, these customers may have the option to purchase from national distributors, as well as smaller or regional distributors.

64. Therefore, the relevant geographic market for the provision of veterinary clinic distribution and distribution to large corporate accounts is no broader than the United States, and it may also be appropriate to analyze the Proposed Transaction's competitive effects in smaller, regional relevant geographic markets.

## HARM TO COMPETITION

65. Covetrus and MWI are the largest competitors in the markets for veterinary clinic distribution and distribution to large corporate accounts. The Proposed Transaction is likely to eliminate the intense head-to-head competition between Defendants, leading to higher prices, reduced product offerings, and diminished service for veterinary clinics. In addition, as further described below, the Proposed Transaction would significantly increase market concentration, resulting in post-merger Herfindahl-Hirschman Index ("HHI") levels and market shares that give rise to a presumption of illegality.

### A. The Proposed Transaction Will Eliminate Direct, Head-to-Head Competition Between Covetrus and MWI, Resulting in Higher Prices and Lower Quality Services

66. The Proposed Transaction would eliminate significant, head-to-head competition between the two largest veterinary clinic distributors nationwide. Covetrus and MWI are each other's closest competitor, and customers ranging from the largest corporate accounts to small, independent veterinary practices benefit from the fierce competition between the two in the form of lower prices and better services. Covetrus and MWI compete vigorously on price and non-price terms in veterinary clinic distribution for both corporate and independent veterinary clinics to win business from each other. Indeed, Covetrus and MWI sales representatives regularly

compete with each other to offer more favorable prices and service terms to veterinary clinic customers. The Proposed Transaction would significantly reduce those benefits by eliminating competition between Covetrus and MWI, to the detriment of veterinary clinics and, ultimately, American pet owners.

*1. Covetrus and MWI Are Each Other's Closest Competitor*

67. Covetrus and MWI regularly [redacted] in the ordinary course of business. Covetrus executives frequently refer to MWI as Covetrus's [redacted] and the company's CEO described the [redacted] between Covetrus and MWI [redacted] Other Covetrus senior executives have similarly referred to this competition with MWI as a [redacted] due to MWI's extreme aggressiveness in offering price reductions and rebates to veterinary clinic customers. MWI's executives similarly explain in ordinary course documents that the company's [redacted] For example, an MWI executive explained that MWI's [redacted] was an intentional tactic [redacted] A [redacted]

68. Veterinary clinic customers and other market participants also recognize Covetrus and MWI as each other's closest competitor. For many veterinary clinic customers, Covetrus and MWI are their top two distributor options, and in some instances, the only two options.

69. Large corporate accounts seeking a primary distributor often seek RFPs from only a few companies, and for many of these corporate accounts, Covetrus and MWI are their best options.

No distributor other than Covetrus and MWI can offer the same product breadth, geographic reach, and other terms that large corporate accounts value.

70. Although independent veterinary clinics may in some cases have additional options for distributors that can serve their local area, Covetrus and MWI are also each other's closest competitor for independent veterinary clinics.

*2. Covetrus and MWI Compete Intensely on Price*

71. Covetrus has acknowledged that [redacted], stating that [redacted] Specifically, customers use the sign-on bonuses, discounts, and rebates they receive from each company to obtain better terms from the other. In turn, Covetrus and MWI push each other to offer higher bonuses, as well as deeper rebates and discounts, to levels that no other distributor can match. The price that clinics pay for their supplies ultimately affects the cost of veterinary care.

72. Defendants' ordinary course documents demonstrate vigorous price competition between Covetrus and MWI for both large corporate accounts and independent veterinary clinics. Covetrus's President of North America emailed the company's CFO stating, [redacted]

73. In one example, an MWI representative described [redacted]. In response to Covetrus's offer, the same MWI representative explained internally that [redacted] Ordinary course documents from Covetrus [redacted] on one of Covetrus's customers by [redacted]. In 2024, one Covetrus executive observed that [redacted]

[redacted] Similarly, in response to [redacted], MWI sales representatives were authorized to [redacted] Another example involved MWI offering independent clinics [redacted] across the board to win business from Covetrus.

74. In the midst of the price war with MWI, Covetrus [redacted]: (1) VetSuite and (2) [redacted]

75. First, Covetrus launched VetSuite in the first quarter of 2024 [redacted]. Indeed, Covetrus's CFO stated in an email to another Covetrus executive, [redacted]

76. Covetrus's VetSuite, which focuses mostly on independent veterinarians, is a bundle of products that may include in-clinic distribution, practice management software, an online pharmacy, and an integrated payment solution. [redacted]

77. MWI immediately recognized VetSuite as a competitive threat. After the introduction of VetSuite, MWI called it [redacted] and [redacted] One internal MWI presentation laid out the [redacted] posed by

VetSuite, explaining that VetSuite would lead to a [redacted] or MWI's [redacted] with Covetrus. MWI developed a playbook for its sales representatives to implement [redacted]

78. Second, in [redacted], Covetrus developed a strategy known as [redacted] to target MWI. The strategy focused [redacted] The [redacted] strategy enabled Covetrus to [redacted] to winning veterinary clinic business.

79. Covetrus and MWI also price aggressively for clinics affiliated with Group Purchasing Organizations ("GPOs"). In one instance, MWI executive Julia Loew instructed her commercialization team that [redacted] Covetrus has recognized the same dynamic, noting internally that [redacted]

80. The proposed transaction will also likely lead to higher prices for corporate accounts negotiating primary distributor agreements. Because Covetrus and MWI are frequently the final two qualifying bidders in RFP processes to serve as the primary distributor to large corporate

accounts, the parties respond by lowering prices and improving non-price terms to secure the business.

81. Large corporate accounts sometimes negotiate prices directly with animal health suppliers. When such direct negotiations occur, customers continue to order and receive products through distributors, but the product is sold at the price agreed upon between the customer and the supplier. Distributors compete to fulfill these orders and win purchase volume by offering upfront payments, rebates, and discounts off that price, in addition to any discounts or rebates the supplier offers. Suppliers may then compensate distributors for the profit they forgo by selling at the pre-negotiated price. A key component of these arrangements is a distributor rebate tied to the corporate account achieving a minimum purchase commitment with the distributor, typically between [redacted] of the group's total purchasing volume.

82. Like independent clinics, large corporate accounts frequently benefit in the form of lower prices from playing Defendants off each other. For example, in [redacted], one corporate account leveraged competition between Covetrus and MWI to obtain over [redacted] in additional value. Covetrus and MWI competed in multiple rounds to secure the primary distributor relationship with this corporate account, improving terms like unit cost, freight savings, signing bonuses, and rebates. After reviewing final offers, the corporate account told MWI that [redacted] prompting MWI to build a [redacted] MWI improved its offer with [redacted] Covetrus, recognizing that [redacted] and that Covetrus would [redacted] decided to [redacted]

83. Other large corporate accounts have also negotiated with both Defendants for higher rebates before ultimately selecting one to serve as their primary distributor.

*3. Covetrus and MWI Compete Intensely on Non-Price Factors*

84. Covetrus and MWI also compete by offering superior service to both independent veterinary clinics and larger corporate accounts. Service often plays a key role in a customer's decision to purchase from one distributor over another. [redacted]

85. Indeed, Covetrus has also recognized the importance of customer service [redacted], noting that [redacted] and concluding that [redacted]

*4. Other Market Participants Would Not Meaningfully Constrain the Merged Firm*

86. Other market participants cannot replicate the favorable price and non-price terms that Covetrus and MWI offer to customers. Other distributors lack the scale and/or geographic reach to consistently match Defendants' steep discounts, rebates, favorable shipping terms, and other benefits. Manufacturers and retailers sell only a limited number of products. Even Patterson, the third largest competitor in the market [redacted].

87. Moreover, while Patterson, widely recognized as the third-largest distributor with a national presence, and Midwest, the fourth largest veterinary clinic distributor, have competed

for and in some cases won primary distributor positions, each has deficiencies that limit their competitive significance relative to Covetrus and MWI. Covetrus internal documents assert that Patterson [redacted] as Covetrus and MWI. When competing to be the primary distributor for a large corporate account in July 2026, Covetrus noted that [redacted] Covetrus executives also characterized Patterson as having [redacted] And Covetrus was right [redacted]. Large corporate accounts likewise recognize Patterson's [redacted]

88. Midwest is an even more distant competitor and is also [redacted] Midwest only recently expanded its geographic reach to the West Coast after it acquired Victor Medical Company in November 2024. Even after this acquisition, most large corporate accounts do not consider Midwest to be nearly as competitively significant as Covetrus or MWI. [redacted] Covetrus and MWI have the geographic breadth and financial scale to offer deeper discounts than either Patterson or Midwest can consistently provide.

89. Additionally, online ordering tools like Vetcove are not a viable alternative to veterinary clinic distribution and do not compete with the parties. Vetcove describes itself as "neither a distributor, nor a buying group," and does not buy, sell, market, store, package, ship, or deliver products to veterinary clinics. Many veterinarians use Vetcove to facilitate their purchases of veterinary supplies from distributors or manufacturers with which they already have accounts.

Veterinary clinic distributors and other suppliers fulfill the orders placed on Vetcove. Vetcove's platform has helped veterinarians negotiate prices with distributors like Covetrus and MWI. But Vetcove itself does not distribute any veterinary supplies, and it has not negated the importance of veterinary clinic distribution. Indeed, Covetrus's and MWI's overall market shares have remained relatively stable even over a decade after Vetcove launched in 2015.

90. Without the competitive pressure of the significant head-to-head competition between Covetrus and MWI, the Proposed Transaction will likely result in higher prices and lower service quality for vet clinics.

**B. The Proposed Transaction Is Presumptively Unlawful Because It Will Significantly Increase Market Concentration**

91. If the Proposed Transaction is consummated, the combined firm would have a presumptively illegal share of both the U.S. veterinary clinic distribution market and the market for distribution to large corporate accounts. The Proposed Transaction would also significantly increase concentration in these already highly concentrated markets. Therefore, under the relevant case law and the Merger Guidelines, the Proposed Transaction is presumptively unlawful.

*1. The Proposed Transaction Will Result in Presumptively Unlawful Market Shares in the Market for Veterinary Clinic Distribution*

92. In the veterinary clinic distribution market, Covetrus and MWI already control a significant [redacted] of sales. Post-transaction, the combined entity would control over 50% of the veterinary clinic distribution market nationwide, significantly higher than the 30% market share recognized by courts as presumptively illegal. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 364-65 (1963); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 52-55 (D.D.C. 2015); 2023 U.S. Merger Guidelines § 2.1. Ordinary course documents from market participants,

including Covetrus and MWI, reflect this market share, with some estimating Defendants' combined national share as over [redacted]%:

[redacted]

93. By consolidating Covetrus's and MWI's shares, the Proposed Transaction is likely to substantially increase concentration in a relevant market that is already highly concentrated. The Merger Guidelines, federal and state agencies, and courts assess market concentration using the HHI. The HHI is calculated by totaling the squares of the market shares of every firm in the relevant market. For example, a market with five firms, each with 20% market share, would have an HHI of 2000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2000$). The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10{,}000$).

94. Under the Merger Guidelines, a merger is presumed likely to create or enhance market power—and is presumptively illegal—when the post-merger HHI exceeds 1,800 and the merger increases the HHI by more than 100 points. The Proposed Transaction would significantly increase market concentration in the market for veterinary clinic distribution, indicating its likely negative impact on competition.

95. The national market for veterinary clinic distribution is already highly concentrated, and the Proposed Transaction would balloon that number to well exceed an HHI of 1,800 and an increase of 100 points.

96. If the Proposed Transaction is permitted to proceed, the combined firm would have over 50% market share, exceeding the 30% threshold that triggers a presumption of illegality under relevant case law.

97. Covetrus's and MWI's combined market shares for veterinary clinic distribution may also exceed the threshold for a presumption of illegality in local markets across the United States.

98. The post-merger HHI and HHI increase in the market for veterinary clinic distribution give rise to a presumption of competitive harm in many local markets.

99. The Proposed Transaction is presumptively unlawful in the market for veterinary clinic distribution regardless of whether competition is assessed geographically at a national or local level.

*2. The Proposed Transaction Will Result in Presumptively Unlawful Market Shares in the Market for Distribution to Large Corporate Accounts*

100. The Proposed Transaction is likely to have a particularly significant impact on concentration in the market for distribution to large corporate accounts. Large corporate accounts face an even more limited set of viable options, as competition from smaller regional distributors cannot meet the needs of these clinics.

101. Large corporate accounts that use a primary distributor consider Covetrus, MWI, and Patterson to be viable primary distributors. Although some large corporate accounts also send RFPs to Midwest, Covetrus, MWI, and Patterson win the vast majority of opportunities, indicating a more limited competitive set of primary distributors for corporate accounts.

102. The Proposed Transaction would result in a combined market share of over 60% and an HHI increase that clearly give rise to a presumption of competitive harm in the market for distribution to large corporate accounts.

103. Accordingly, the Proposed Transaction would result in a post-Merger HHI and increase in concentration that clearly establish a presumption of competitive harm.

## NO COUNTERVAILING FACTORS JUSTIFY THE PROPOSED TRANSACTION

### A. Defendants Cannot Demonstrate That Entry Would Be Timely, Likely, or Sufficient to Offset the Anticompetitive Effects of the Proposed Transaction

104. Defendants cannot demonstrate that expansion by existing firms or new entry would be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Transaction. Very few veterinary clinic distributors have entered the market in the last few decades—none with a national footprint—and a series of mergers over the past 20 years have resulted in a concentrated market dominated by Covetrus and MWI. Firms seeking to expand or enter the market for veterinary clinic distribution, and the market for distribution to large corporate accounts, face significant structural barriers that make entry unlikely, including [redacted] Indeed, MWI's own documents boast that [redacted]

105. As Covetrus's private equity owner, CD&R, recognizes, [redacted] Similarly, MWI's

parent entity, Cencora, explicitly stated in an ordinary course document that [redacted] for building a successful distribution operation.

106. A viable national distributor must operate a strategically dispersed network of distribution centers. Today, the next-closest distributors to Covetrus and MWI operate fewer distribution centers, and replacing MWI's competitive presence would require years of investment and substantial capital. Creating an in-clinic national broadline distributor network with similar product breadth and geographic reach as Covetrus or MWI is time and resource intensive. Internal MWI documents suggest that [redacted]

107. *De novo* entrants must also secure manufacturer relationships, build customer networks (including access to national accounts), implement ordering systems, and develop or outsource compliant fulfillment operations. Whereas [redacted], new entrants must secure comparable supplier terms, access, and trust with the [redacted]. Large corporate accounts in particular value established, reliable distributors with a demonstrated history serving similar corporate accounts. Substantial delays, backorders, issues with product packaging, or other failures to deliver products on a timely or high-quality basis can put the life and health of pets at risk.

108. Entrants seeking to distribute pharmaceuticals must also navigate complex regulatory requirements, both nationally and at the state level.

109. In addition to structural barriers, Covetrus and MWI also benefit from economic advantages that new entrants may be unable to replicate. Covetrus and MWI rely on [redacted], creating

customer incentives that smaller regional firms would need to match to compete effectively. Rebate structures are particularly influential for corporate accounts. For instance, Covetrus designs [redacted] around [redacted] and leverages them across corporate accounts, which presents yet another barrier to entry.

110. Repositioning by manufacturers would not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Transaction. Manufacturers' ability to pivot to the direct-sales model varies significantly by manufacturer. Manufacturers also typically carry narrow product portfolios and maintain small sales forces. To compete with veterinary clinic distributors, they would need to expand product offerings, negotiate new supplier contracts, enlarge their fleets and sales teams, and lower costs to match distributor pricing. Even for a large manufacturer, it can take years and tens of millions of dollars to self-distribute just a few products.

111. Vetcove does not meaningfully reduce barriers to entry. While Vetcove improves price transparency, it does not replace distributors. Even though veterinarians may use Vetcove to make purchases from Covetrus and MWI, veterinarians continue to rely on distributors because of their broad product offerings, volume discounts and rebates, private-label products, geographic reach, logistical convenience, and other offerings. Veterinary clinics that have volume agreements with distributors—i.e., a commitment to purchase 80% of supplies through Covetrus—remain incentivized to purchase from Covetrus on all platforms, including Vetcove, to maintain their substantial discounts. As Covetrus recognizes, corporate accounts use Vetcove to reinforce existing distributor relationships, not to broaden access for smaller firms. Corporate accounts may also determine which distributors appear on purchasing platforms such as Vetcove, to ensure minimum volume rebates and as a result, smaller or new distributors may be excluded

entirely from visibility. Tellingly, no new distributor that rivals the scale of Covetrus and MWI has emerged even with Vetcove's launch, demonstrating further that entry barriers remain high.

### B. Defendants Cannot Demonstrate That Any Efficiencies Would Offset the Anticompetitive Effects of the Proposed Transaction

112. Defendants cannot demonstrate that the Proposed Transaction would likely generate verifiable, cognizable, merger-specific efficiencies sufficient to rebut the structural presumption or offset the likely and substantial competitive harm from the Proposed Transaction.

## VIOLATIONS ALLEGED

### Count I: Illegal Agreement (FTC Only)

113. The allegations in Paragraphs 1 through 112 above are incorporated by reference as though fully set forth herein.

114. The Proposed Transaction constitutes an unfair method of competition in violation of the FTC Act, as amended, 15 U.S.C. § 45.

### Count II: Illegal Merger (All Plaintiffs)

115. The allegations in Paragraphs 1 through 112 above are incorporated by reference as though fully set forth herein.

116. The Proposed Transaction constitutes a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and thereby Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

## PRAYER FOR RELIEF

117. Accordingly, Plaintiffs respectfully request:

A. The Proposed Transaction be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45;

B. The Court permanently enjoin Defendants from taking any further steps to consummate the Proposed Transaction, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

C. The Court award costs of this action to Plaintiff States, including attorneys' fees; and

D. Plaintiffs be awarded such other relief as the Court may deem just and proper.

Dated: November 13, 2026

Respectfully submitted,

/s/ Ethan D. Stevenson

ETHAN D. STEVENSON
NY Bar No. 5597679 (*pro hac vice*)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel.: 202.531.8971
Email: estevenson1@ftc.gov

LAURA R. HALL (NY Bar No. 4337408)
Lead Counsel

NATHAN BRENNER (IL Bar No. 6317564) (*pro hac vice*)

KENDALL ALFORD (DC Bar No. 90028932) (*pro hac vice*)

JORDAN ANDREW (MD Bar No. 0912150027) (*pro hac vice*)

STEPHANIE BOVEE (VA Bar No. 46678) (*pro hac vice*)

NATALIE HAYES (DC Bar No. 1002458) (*pro hac vice*)

EVAN JOHNSON (NY Bar No. 5771167; DC Bar No. 1722341) (*pro hac vice*)

MATTHEW JOSEPH (DC Bar No. 1030157) (*pro hac vice*)

WADE LIPPARD (DC Bar No. 1616824) (*pro hac vice*)

WILLIAM MACCI (DC Bar No. 90027501) (*pro hac vice*)

Of counsel:

DANIEL GUARNERA
Director
Bureau of Competition
NY Bar No. 5346937 (*pro hac vice*)

DAVID SHAW
Deputy Director
Bureau of Competition
VA Bar No. 79048 (*pro hac vice*)

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General

Sarah M. Pelton

SARAH M. PELTON (*pro hac vice* forthcoming)
Assistant Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Email: sarah.pelton@azag.gov

*Attorney for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF ARKANSAS:

TIM GRIFFIN
Attorney General

AMANDA WENTZ (*pro hac vice* forthcoming)
Senior Assistant Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-2007
Email: amanda.wentz@arkansas.gov

JOHNATHAN CARTER (*pro hac vice* forthcoming)
Assistant Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-2007
Email: johnathan.carter@arkansas.gov

*Attorneys for Plaintiff State of Arkansas*

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

EMILIO VARANINI
Supervising Deputy Attorney General

ROMA B. PATEL (*pro hac vice* forthcoming)
MEREDITH TRUEBLOOD
Deputy Attorneys General
300 South Spring Street, Suite 1700
Los Angeles, CA 90013
Telephone: (213) 269-6326
Email: Roma.Patel@doj.ca.gov
Meredith.Trueblood@doj.ca.gov

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

BRYN A. WILLIAMS
First Assistant Attorney General

ELIZABETH W. HEREFORD (*pro hac vice* forthcoming)
Assistant Attorney General
Colorado Department of Law
1300 Broadway, 9th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: elizabeth.hereford@coag.gov
bryn.williams@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF MAINE:

AARON M. FREY
Maine Attorney General

/s/ Christina M. Moylan
CHRISTINA MOYLAN (*pro hac vice* forthcoming)
Assistant Attorney General
Chief, Consumer Protection Division
MICHAEL DEVINE (*pro hac vice* forthcoming)
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333-0006
Phone: (207) 626-8800
Email: christina.moylan@maine.gov
michael.devine@maine.gov

*Attorneys for Plaintiff State of Maine*

FOR PLAINTIFF STATE OF MICHIGAN:

DANA NESSEL
Michigan Attorney General

SCOTT E. OLMSTED (*pro hac vice* forthcoming)
Assistant Attorney General
Corporate Oversight Division
525 West Ottawa Street
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: olmsteds1@michigan.gov

*Attorney for Plaintiff State of Michigan*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General

ELIZABETH ODETTE
Manager, Antitrust Division

Justin MOOR (*pro hac vice* forthcoming)
Assistant Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1060

Jon M. Woodruff (*pro hac vice* forthcoming)
Assistant Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 300-7425

Email: justin.moor@ag.state.mn.us
jon.woodruff@ag.state.mn.us
elizabeth.odette@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEBRASKA:

MIKE HILGERS
Nebraska Attorney General

BENJAMIN SWANSON (*pro hac vice* forthcoming)
Assistant Attorney General
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Telephone: (402) 471-7759
Email: benjamin.swanson@nebraska.gov

*Attorney for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
ATTORNEY GENERAL OF NEW YORK

ELINOR R. HOFFMANN
Chief, Antitrust Bureau

AMY E. MCFARLANE
Deputy Chief, Antitrust Bureau

JULIANA KARP
Assistant Attorney General

MARIA LUISA DI LAURO
Assistant Attorney General

Christopher D'Angelo Chief Deputy
Attorney General Economic Justice Division
(pro hac vice forthcoming)

Telephone: 212-416-8269
Email: elinor.hoffmann@ag.ny.gov
amy.mcfarlane@ag.ny.gov
juliana.karp@ag.ny.gov
luisa.dilauro@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF NORTH CAROLINA:

JEFF JACKSON
Attorney General of North Carolina

KUNAL CHOKSI
Senior Deputy Attorney General

[signature]

FRANCISCO BENZONI (*pro hac vice* forthcoming)
CHARLES G. WHITE (*pro hac vice* forthcoming)
Special Deputy Attorneys General
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
Email: fbenzoni@ncdoj.gov
cwhite@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

FOR PLAINTIFF STATE OF OHIO:

D. ANDREW WILSON
Ohio Attorney General

BETH A. FINNERTY
Section Chief, Antitrust Section
EDWARD J. OLSZEWSKI
Assistant Section Chief, Antitrust Section
30 East Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Fax: (614) 995-0266

Thomas Collin

THOMAS J. COLLIN (*pro hac vice* forthcoming)
Principal Assistant Attorney General, Antitrust Section
615 West Superior Avenue, 11th Floor
Cleveland, OH 44113
Telephone: (216) 787-4484
Fax: (866) 503-2011
Email: Thomas.Collin@OhioAGO.gov
Beth.Finnerty@OhioAGO.gov
Edward.Olszewski@OhioAGO.gov

*Attorney for Plaintiff State of Ohio*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

Rachel K. Sowray

RACHEL K. SOWRAY (*pro hac vice* forthcoming)
Senior Assistant Attorney General
GINA KO (*pro hac vice* forthcoming)
Senior Assistant Attorney General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.
Portland OR 97201
Telephone: (503) 689-0249
Email: Rachel.Sowray@doj.oregon.gov
Gina.Ko @doj.oregon.gov

*Attorney for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

WILLIAM D. WASSDORF
Deputy Attorney General for Civil Litigation

THOMAS D. YORK
Chief, Antitrust Division

______________________________
COLE PRITCHETT
Assistant Attorney General, Antitrust Division
SDNY Bar ID: 5608682
NYS Bar ID: 5608682
WILLIAM SHIEBER
Senior Staff Attorney, Antitrust Division

Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1162
Fax: (512) 473-8301
Email: thomas.york@oag.texas.gov
cole.pritchett@oag.texas.gov
william.shieber@oag.texas.gov

*Attorneys for Plaintiff State of Texas*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 13, 2026, I electronically filed a true and correct copy of the foregoing document using the United States District Court for the Southern District of New York CM/ECF System.

I FURTHER CERTIFY that I served the foregoing document on the following counsel via electronic mail:

| | |
|---|---|
| Ian Conner<br>Latham & Watkins LLP<br>555 Eleventh Street, N.W., Suite 1000<br>Washington, D.C. 20004<br>Phone: 202.637.1042<br>Email: Ian.Conner@lw.com<br><br>Counsel for Defendants<br>CVET TOPCO, L.P.<br>CLAYTON, DUBILIER & RICE, LLC<br>TPG, INC.<br>COVETRUS, INC. | Jan M. Rybnicek<br>Freshfields US LLP<br>700 13th Street NW, 10th Floor<br>Washington, D.C. 20005<br>Phone: 202.777.4500<br>Email: jan.rybnicek@freshfields.com<br><br>Counsel for Defendants<br>CENCORA, INC.,<br>MWI VETERINARY SUPPLY, INC. |

Ethan D Stevenson

Ethan D. Stevenson
NY Bar No. 5597679
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel.: 202.531.8971
Email: estevenson1@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*